## Case No. 15,239.

### UNITED STATES v. GOULD.

[8 Am. Law Reg. 525.]

District Court, S. D. Alabama. Spring Term. 1860.

SLAVE TRADE—POWER TO PROHIBIT—STATE SOVEREIGNTY—IMPORTATION OF NEGROES—INDICTMENT.

1. Congress has the constitutional power to prohibit the foreign slave trade.

2. That power is part of the power to regulate foreign commerce. It is commercial in its character, and has the same extent and application, and the same limits, as the power to regulate foreign commerce.

3. The several states have the general sovereign right to determine who may or who may not live within their limits, to fix the political and social status of each inhabitant, and to prescribe his rights and punish their violation within its limits

4. This portion of state sovereignty has not been wholly surrendered to the general government. It is surrendered only to the extent and for the purposes specified by the constitution. As respects negroes, imported as slaves, it is surrendered only so far as to allow the prohibition of such importation, and as a means to this, the removal of negroes unlawfully imported. The power to prescribe and to protect the rights of such negroes after the importation is entirely complete and ended, and they have become mingled with the mass of the population of a state, is exclusively in the state government.

5. It is settled, by repeated decisions of the supreme court, that the commercial power of the general government extends to and covers (exclusively of the interference of state laws,) the importation of either goods or persons, until the commercial transaction of importation is complete and ended, and no further. When the goods or persons imported pass out of the possession or control of the importer, his agents and employees, and become mingled with the mass of property or population of a state, they then become subject to the state jurisdiction and laws.

6. The laws of the United States prohibiting the foreign slave trade, are to be construed in reference to the mischief intended to be remedied, and to the nature, extent and limits of the constitutional power of congress over this subject.

7. The sole mischief intended to be remedied was the importation of negroes as slaves. It was not and is not, the manner in which either free negroes or slaves are regarded or treated in any state.

8. These laws extend to all persons who in any manner, directly or indirectly, participate, aid or abet, in the prohibited importation. They do not extend to offences committed in a state against the rights of a negro who had been previously unlawfully imported by some other person, after he has passed out of the possession or control of the importer and become mingled with the mass of the population of a state.

9. An indictment which only charges that the accused, within this state, did hold, sell, or otherwise dispose of, a negro or a slave, who had previously been unlawfully imported by some other persons, without alleging that the accused did participate, aid or abet, in the unlawful importation, is fatally defective.

10. The mode of procedure prescribed by the 7th section of the act of April 20, 1818, for enforcing the penalty for violating its provisions, is a qui tam action, and no other. Therefore an indictment does not lie under that section.

A. J. Requier, U. S. Dist. Atty.

George N. Stewart, Wm. Boyles, and Robert B. Armstead, for defendants.

JONES, District Judge. Mr. Gould is indicted under the 7th section of the act of congress of April 20, 1818 [3 Stat. 450], prohibiting the foreign slave trade. There are three counts in the indictment. The first count charges, "that Horatio N. Gould, late of said district, heretofore, to wit, on the first day of March, A. D eighteen hundred and fifty-nine at Mobile county, to wit, in the district aforesaid, and within the jurisdiction of this court, a certain number, to wit, one female negro, whose name is to these jurors unknown, and who had, then and there, lately unlawfully brought into the jurisdiction of the said United States, to wit, on the twentieth day of February, A. D. eighteen hundred and fifty-nine, at the county and district and within the jurisdiction aforesaid, in a manner and from a foreign place to these jurors unknown, by a certain number, to wit, one person, whose name is to these jurors unknown, did, then and there, to wit, at the time and place aforesaid, with force and

arms, unlawfully and knowingly hold the said negro, so then and there unlawfully brought in as aforesaid, as a slave, for a certain time, to wit, for three days, contrary to the power of the statute in such cases made and provided," &c. The second and third counts are substantially like the first, except that the second count charges, that Gould did "sell" (instead of "hold";) and the third count charges that he did "dispose, otherwise than by selling her, of' said negro," &c. The accused has demurred to each count in the indictment. This presents. for decision the question whether this indictment charges in a legal and sufficient manner, an indictable offence against the laws of the United States. The objections urged against the indictment are: 1st. That it is too vague and uncertain, in this, that it does not state the name of the negro, or any description of her, except that it is a female, nor the names or description of a foreign place from which, or persons by whom, she is alleged to have been unlawfully brought in. 2d. That it does not show that Gould had any participation whatever in the importation of the negro; and that the law applies 'only to the importers, their agents or employees. 3d. That if the law was intended to apply to other persons than the importers, their agents or employees, it is to that extent unconstitutional.

Passing over the supposed want of sufficient certainty, in the description of the offence charged, I shall proceed at once to the more important question raised by the demurrer. It is conceded by the district attorney of the United States, that the indictment is under the 7th and not the 6th section of the act of 20th April, 1818, and that he does not charge, and does not expect to prove, that Mr. Gould in any manner participated in, 'or' had any knowledge of the illegal importation. The charge then, when stripped of the legal phraseology of the indictment, is simply this, that Mr. Gould, without any participation in the illegal importation, did, within this district, hold, sell, or otherwise dispose of, as a slave, a negro who had been previously unlawfully imported by some other person. The material question is, whether this is, or is not, an indictable offence against the laws of the United States.

No case has been referred to in the argument, nor have I been able to find any case, in which this question has been decided by any court. It is a novel question, and recent events have rendered it one of much interest and importance. It has been the settled policy of our country, for more than fifty years, to prohibit, under severe penalties, the importation of slaves. The laws enacted to carry out this policy had the support and approval of the statesmen and people of all sections of our country. Within the last three or four years a few persons in the South have questioned the constitu-

tional power of congress to pass these laws. Some others, admitting the power, have denied the policy of these laws, and earnestly urged their repeal. There have no doubt been some recent violations of these laws. The whole subject has been much discussed, and most men must have formed some opinion upon it. For my own part I have examined the subject very carefully. The result of that examination is a thorough and clear conviction that congress has the constitutional power to prohibit the importation of slaves; that it is wise, just and politic to prohibit it, and that the laws prohibiting it ought not to be repealed, but ought to be maintained, respected, and strictly enforced. As there are several similar cases pending in this court for the Middle district of Alabama, and this is the first which has been brought before me for decision, I think it due to the importance of the question, and to the parties interested in it, that the reason and extent of my decision should be stated as clearly as possible. This is the more proper, because (much to my regret) there is no appeal in such cases to any higher tribunal. Knowing that if I commit an error in deciding this question, it cannot be corrected, I have examined it carefully, and reflected on it maturely. If my opinion is erroneous, it is an error of judgment alone.

The proper determination of this question necessarily requires an examination of the nature and extent of the constitutional power of congress over this subject, and a construction of the acts of congress upon it. In construing both the constitution and statutes, the great object is to ascertain what was the true meaning and intention of those who framed them. The words of a statute are the principal, but not the only means of determining the meaning and intention of the legislature. There are many well settled rules and principles of construction of statutes resorted to by the courts to aid in arriving at the true intention. Two of the rules of construction I shall state and use in this case. The first is to consider the mischief intended to be remedied. The second is, never to give a statute such a construction as would render it unconstitutional, if it will possibly admit of any other construction which would make it consistent with the constitution. We will first inquire: What was the mischief intended to be remedied by the convention which framed the constitution, and by congress in passing this law? It is well known from the debates of the convention, and the contemporaneous history of the times, that the framers of the constitution considered the foreign slave trade as a great evil, which ought to be suppressed. That was the mischief which had been the subject of complaint, and which they designed to remedy. Nobody had complained of the manner in which free negroes were regard-

ed and treated, in any of the states. That was never thought of by the convention. The same remark is equally applicable to congress, which passed these laws. The mischief which both the convention and congress intended to remedy, was, unquestionably, the foreign slave trade, and nothing else. This proposition I think too clear to admit of dispute, but as I considered it very important, I will refer to two instances, to show, not only that it has been recognized, but how it has been practically applied by the executive branch of our government, in the construction and execution of these laws. I refer to two official opinions given by Mr. Wirt, as attorney-general. They are not indeed binding authorities on the courts, but from his known ability as a lawyer, his official opinions, adopted and acted on by the government, are certainly entitled to much respect. The first section of the act of 20th April, 1818, provides that "it shall not be lawful to import or bring, in any manner whatever, into the United States from any foreign place, &c., any negro, &c. with intent to hold, &c., any such negro, &c., as a slave, or to be held to service or labor; and any ship, &c., employed in any importation as aforesaid, shall be liable to seizure, &c." In 1821 a Mr. McFarlane, brought into New York, from the Island of Tobago, (a foreign place,) on the schooner Sally, a negro boy, who was free in Tobago. The negro boy came voluntarily, and with the consent of his mother, as the servant of Mr. McFarlane. This was done with the knowledge of the captain of the schooner. The collector of the port of New York considered this a violation of the law, and seized the schooner. The case was reported to the secretary of the treasury, who referred it to Mr. Wirt, as attorney-general, for his opinion. It is manifest that the case came within the letter of the law. A negro was brought into the United States from a foreign place with intent to hold him to service or labor. It is equally clear that the case did not come within the mischief which the law was made to remedy. Mr. Wirt gave it as his opinion that this was not a violation of the law. 5 Op. Atty. Gen. 736. Soon afterwards a somewhat similar case was referred by the president to the attorney-general. The wife and children of Mr. Fayoll, of Charleston, embarked for France in 1820, taking with them as a servant a negro girl slave, belonging to Mr. Fayoll, intending to return in 1822. Mr. Fayoll wished the negro to return to the United States with his family. The question submitted was, whether this would be a violation of the law. It was a case where a negro would be brought into the United States from a foreign country, with intent to hold the negro as a slave. It was clearly within the letter of the law, and Mr. Wirt seems to have been conscious of this. He says,

however: "I am of opinion that the case is not within the meaning of the law; that the legislature were not looking to the case of persons going abroad on a visit, or to sojourn for a short time, and taking a servant with them from the United States, which they were desirous of bringing back with them; that this was not at all the mischief which congress had in view; that they meant not to prohibit the return of a body servant with his master or mistress, but an original importation or bringing in to increase the stock of slaves in the United States." And he accordingly gave it as his opinion that the negro might be brought back without the violation of any law of the United States. 1 Op. Atty. Gen. 503. This opinion of Mr. Wirt was afterwards fully sustained by the decision of the supreme court of the United States in the case of U. S. v. Skiddy, 11 Pet. [36 U. S.] 73, in which the precise point was presented, and decided in accordance with Mr. Wirt's opinion. See also to the same point U. S. v. The Ohio [Case No. 15,914]. In construing the constitution and statutes on this subject we will be greatly aided by constantly bearing in mind that the foreign slave trade was the sole mischief which was intended to be remedied.

There are other principles of construction applicable to the constitution, which are now so well settled that they may properly be called political and legal maxims. The general government is a special and limited government. It has no other sovereign powers than those conferred upon it by the constitution. On the contrary, the several states are original sovereignties. Each state has all the rights and powers, usually appertaining to a sovereign state, except such as it has, by the constitution, conferred upon the general government. Among the rights and powers usually appertaining to every sovereign state, are, the power to determine who may or may not come into its territories from other countries, to fix and determine the social and political relations, in which all its inhabitants shall stand to each other, or in other words, the social and political status of every inhabitant; to determine the personal rights of every one within its borders, and to protect those rights and punish their violation. These principles are asserted and established by the supreme court in the case of City of New York v. Miln, 11 Pet. [36 U. S.] 102. That the states have entirely surrendered all these sovereign powers to the general government has never been contended by the most latitudinarian construers of the constitution. Let us inquire to what extent these powers have been surrendered to the general government, so far as they apply to the slave trade.

It is well known that the regulation of foreign commerce was one of the principal inducements for the formation and adoption of the constitution. The African slave trade was then, and had long been, an extensive

and lawful branch of the foreign commerce of our country. Some of the states at that time permitted and some had prohibited the importation of slaves. The question, whether the power to control or prohibit that trade should be given to the general government or not, was one of much difficulty, and was maturely considered by the convention. The result was, that by the constitution the power "to regulate commerce with foreign nations," was given to congress in general and comprehensive terms. But in respect to the foreign slave trade, a special and particular provision was inserted in these words: "Sec. 9. The migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by the congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importation not exceeding ten dollars for each person." It is very plain, that the object and effect of this special clause are to define and limit the previous general grant of power over foreign commerce. The definition is, that congress, as to this particular branch of foreign commerce, shall have power to prohibit it; and the limitations are, that this prohibitory power shall not be exercised prior to the year 1808, and the duty imposed shall not exceed ten dollars for each person. The language of the constitution seems to me too clear to admit of a reasonable doubt, or to require reasoning or authorities to show its meaning. If such authorities were needed, the whole contemporaneous history of the country, the reported proceedings and debates of the convention and of the state conventions which adopted the constitution, and of the subsequent action of every department of the government from that time to this, all concur in showing that such was the true intent and meaning of that part of the constitution. I have no doubt or, hesitation, therefore, in holding that congress has the constitutional power to prohibit the foreign slave trade, and to pass all laws necessary and proper to carry into execution that power. I think it equally clear, from the nature of the subject, and the manner in which it is introduced and expressed in the constitution, that this power is part of the power conferred upon congress over foreign commerce. It was so considered in the debates of congress on the act of 1807 [2 Stat. 426], and by the supreme court in the case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, and in The Passenger Cases, 7 How. [48 U. S.] 283. See, also, 2 Story, Const. § 1337. In its nature, then, this power is commercial in its character. Having now ascertained what was the mischief intended to be remedied—that is, the foreign slave trade—and the nature of the power conferred upon congress on this subject—that is, that it is part of the commercial power—we will next proceed to enquire into the extent and limit of this power. In doing so I shall endeavor to follow what seem to me the clearest and safest precedents.

afforded by our political and judicial records.

The first precedent to which I shall refer is, the old alien law passed in 1798 [1 Stat. 570], during the federal administration of the elder Adams. That law authorized the president, under certain circumstances, to remove aliens out of the country. It was strongly denounced by Mr. Jefferson, Mr. Madison, and all the statesmen of the state rights school of that day, as unconstitutional—a palpable usurpation of power by the general government—and a dangerous encroachment on the rights of the states. Why was it considered unconstitutional? Obviously, because it was an original inherent sovereign right of each state to determine who might or who might not live within its limits, and that power had not been surrendered to the general government. An alien in a state was under the jurisdiction, control and protection of that state. It was for the state to determine whether he might or might not remain within its limits, to prescribe his rights, and punish any violation of them. The alien law was an infringement on these rights of the states, and therefore unconstitutional. It is true, that the unconstitutionality of that law was never passed upon judicially by any court, so far as I can find; but it was most effectually passed upon by the people in the presidential election of 1800. They passed upon its authors a most righteous judgment of condemnation. Nearly sixty years have elapsed since the rendition of that judgment, and it never has been, and I trust never will be, reversed. What principle did it involve and settle? It was this, that the power to determine whether an alien might or might not live in the state, and to prescribe and protect the rights and fix the status of an alien, resident in a state, belonged to the state, and not to the general government; and the power to punish any violation of his rights, as a necessary consequence, belongs also to the state. This principle seems to me clearly applicable to the case now under consideration. When a negro is unlawfully imported, though the importer may intend him as a slave, the law considers and makes him a free man, by expressly providing that no person can ever acquire a legal title to him as property. The law also properly provides for his removal out of the country as one of the means necessary and proper to carry out the execution of the power to prohibit importation. So long as he remains in the possession, or under the control of the importer, or his agents or employees, he is under the power of the general government and its laws. But when the commercial act of importation is entirely complete and ended, and he has passed out of the possession or control of the importer or his agents or employees, and has been mingled with the mass of the population in a state, he is a free negro alien, resident in the state, and like any other free negro in the state, his status, his rights, and his remedies for injuries, are subjects of state jurisdiction and regulation; except (as has been stated)

that the general government may remove him out of the country. While he remains here, however, he is subject to the state laws. and his rights are regulated and protected by them. Alabama has not neglected her duty in this respect. Her laws most amply provide for the protection of his freedom. If any person, knowing him to be free, should buy or sell him as a slave, such person would be subject to ten years imprisonment in the penitentiary, under section 3102 of the Code of Alabama.

The next precedent to which I shall refer is the case of Brown v. Maryland, 12 Wheat. [25 U. S.] 419, decided by the supreme court of the United States in 1827, after great consideration. This case, like the one before me, depended upon the extent and limit of the power over foreign commerce, granted by the constitution to the general government. Congress had passed laws laying duties on goods imported. The legislature of Maryland passed an act requiring every importer of goods into Maryland to pay a license tax of fifty dollars to the state, before he could sell the goods, though he had paid the duties upon them. The constitutionality of this Maryland act was questioned, on the ground that congress had exclusive power over foreign commerce, and the state could not, directly or indirectly, lay any tax on the importation. It was held by the supreme court, that while the imported article remained the property of the importer, in his warehouse in the form or package in which it was imported. it was not subject to state taxation; but when it has passed out of the possession of the importer, and become incorporated and mixed up with the mass of property in the country, it loses its distinctive character of an import, and becomes subject to the taxing power of the state. The same principle was again laid down by the supreme court in The License Cases (1847) 5 How. [46 U. S.] 504. In these cases the laws of New Hampshire, Massachusetts and Rhode Island, imposing a state license tax on the sale of spirituous liquors, under certain quantities, by the importer, were held to be constitutional. These two cases define, with much clearness, the extent and limits of the power of congress as to goods imported. Does not the same principle apply to persons brought into the United States from foreign countries? It was so held by the supreme court, in The Passenger Cases, 7 How. [48 U. S.] 283–573. The legislatures of New York and Massachusetts each passed acts laying a tax on passengers brought into any port of these states from a foreign country. The constitutionality of these acts was questioned, on the ground that the bringing in of emigrants is a branch of foreign commerce, exclusively under the control of the federal government. Several cases, arising under these acts, were taken up to the supreme court. The cases were ably and elaborately argued and re-argued at four different terms of the court, by some of the ablest lawyers in America. The judges of the supreme court were divided in opinion upon the question. Five of them, McLean, Wayne, Catron, Grier and McKinley, held the state laws to be unconstitutional; and four of them, Taney, Woodbury, Daniel and Nelson, held them to be constitutional. Chief Justice Taney, in delivering his opinion, after a course of very able reasoning, says: "I think it, therefore, to be very clear, both upon principle and the authority of adjudged cases, that the several states have a right to remove from among their people, and to prevent from entering, any person or class or description of persons whom it may deem dangerous or injurious to the interests and the welfare of its citizens; and that the state has the exclusive right to determine, in its sound discretion, whether the danger does or does not exist, free from the control of the general government." [Passenger Cases].7 How. [48 U. S.] 467.

Judge McLean, one of the majority, said: "When the merchandise is taken from the ship, and becomes mingled with the property of the people of the state, like other property it is subject to the local law; but until this shall take place, the merchandise is an import, and is not subject to the taxing power of the state, and the same rule applies to passengers. When they leave the ship, and mingle with the citizens of the state, they become subject to its laws." [Passenger Cases] 7 How. [48 U. S.] 405. This case shows, then, that in this respect, the same principle applies to importation of both goods and persons; that is, that until the commercial transaction of importation is complete and ended, they are subject to the commercial power and laws of the United States; but when the commercial transaction of importation is complete and ended, and the goods become mingled with the property, and the persons with the people of a state, they both then become subject to the state jurisdiction and state laws. It obviously makes no difference that the persons are negroes, and intended by the importer as slaves. Whether they are to be considered as slaves or free, as chattels or persons, the same principle applies to them. The cases referred to show the extent and limit of this power over foreign commerce. It covers and extends to the whole commercial transaction of importation; and, in respect to negroes unlawfully imported as slaves, to their removal out of the country. This is its extent and its limit. In my opinion, it never was the intention of the framers of the constitution, that the several states should surrender to the general government this power to fix the status, prescribe the rights and provide for the protection of free negroes, or any other inhabitants of a state. Suppose that a negro, unlawfully imported, is residing in Alabama, either as a free man, or wrongfully held as a slave, and that any person should beat, maim or murder such a negro in Alabama, what law would be violated, and under what law could the offender be tried and punished? Most unquestionably the state law. So, too, if he

is wrongfully deprived of his freedom, it is the state law which is violated, and the state law under which the offender is to be punished. Such an offence has no connection with, or relation to foreign commerce, and is entirely without and beyond the power given to congress over any branch of foreign commerce.

Looking, then, to the mischief intended to be remedied, and to the nature, extent and limits of the constitutional grant of power over this subject, I think the proper construction of the law is, that it embraces and provides for the punishment of every person who, in any manner, directly or indirectly, participates, aids or abets in the importation of negroes as slaves. The capitalist who furnishes the money—the agents who build, charter or fit out a slave ship—the officers and crew who navigate it—those who procure the cargo, or who receive the negroes when landed, or carry them into the interior, or hold, sell, or otherwise dispose of them there, for the importer—are all participants in the unlawful importation, and guilty of an offence against the constitutional laws of the United States, and punishable under those laws. But after such a negro has passed out of the possession or control of the importer and his agents and employees, and has become mingled with the inhabitants of Alabama, if any person beats, murders, or otherwise criminally violates his rights, in this state, the offender is liable to indictment under the state law, and before the state tribunals alone. Whilst, as judge of this court, I shall always be ready and willing to maintain and enforce this, and all other constitutional powers and laws of the general government, it is equally my duty not to go beyond the limits of the constitution, or to encroach, in the slightest degree, upon the rights and jurisdictions of the states.

Under the construction which I give to the law, the indictment in this case is not maintainable. It does not allege that the accused had any connection whatever with the unlawful importation; nor does it allege any facts from which this could be legally inferred. It simply alleges that the accused knowingly held, as a slave, in Alabama, a negro, who had previously been unlawfully imported, by some other unknown person. This, I think, is not an indictable offence under the laws of the United States.

It is contended for the prosecution, that the 6th section of the act of 20th April, 1818, provides for the punishment of the importer, his agents and employees; and that the 7th section (under which this indictment is found) creates a separate and distinct offence, and was intended to embrace the case of a person who, without any participation in the unlawful importation, afterwards holds the negro as a slave. I concur with the district attorney, in thinking that the 7th section intended to create a separate and distinct offence from that created by the 6th section.

It would be very unreasonable, if not absurd, to suppose that congress, after creating an offence by the 6th section, and providing that it should be punished by a forfeiture. not exceeding $10,000 and not less than $1,000, and imprisonment for not less than three nor more than seven years, immediately added another section, providing that the same offence should be punishable by a forfeiture of only $1,000. No doubt a different offence was created by the 7th section, but I do not think the difference is that supposed by the district attorney. By comparing the act of 1818 with the previous act of 21st March, 1807, on the same subject, and bearing in mind the state of things existing when each of these acts was passed, I think the real difference is apparent enough, though from the mere omission of a comma, it is not so clearly expressed in the act of 1818 as in that of 1807. At both of these periods slavery existed in Florida and Mexico, then belonging to Spain, and immediately adjoining the United States. Slaves might be brought into the United States from Africa or from Florida or Mexico. Congress manifestly considered that the person who seized a negro in Africa, and brought him to the United States, was guilty of a much greater offence than one who, living in the United States, near the Florida or Mexican line, should buy a slave from his neighbor in Florida or Mexico, and bring him into the United States. The fifth section of the act of 1807 plainly refers to the first class of offenders, and the 6th section of that act, I think, refers to the latter class of offenders, and provides a milder punishment. The 7th section of the act of 1818 is obviously taken, almost verbatim, from the 6th section of the act of 1807, and, I think, was intended to apply only to the same class of offences. I can see no other sensible meaning and effect that can be given to the qualifying words, "immediately adjoining to the United States." used in each of those sections, and which are not used in the 6th section of the act of 1818. A comma is placed before these qualifying words where they occur in the act of 1807. Thus, "from any foreign kingdom, place or country, or from the dominions of any foreign state, immediately adjoining to the United States," etc.—thus making the words "immediately adjoining to the United States," apply to and qualify the words "foreign kingdom, place or country," as well as the words, "dominion of any foreign state." The very same words are used in the 7th section of the act 1818, omitting the comma between the words "state" and "immediately." This omission of the comma was, I presume, from an inadvertence of the writer, or a mistake of the printer. I cannot believe it was done purposely to change the character and extent of the offence. My construction of these sections of the act of 1818 is, that the 6th section was intended to apply to those who bring in negroes, as slaves from Africa, or other foreign

countries, not immediately adjoining the United States. The 7th section was intended to apply to those who brought them in from Florida or Mexico. This, I think, is the difference between them as to the character of the offence. This construction brings the whole law within the constitutional limits of the power of congress. But even if this construction of the law is not correct, and that contended for by the district attorney is correct, still the indictment cannot be sustained under the 7th section. The offence created by it is not a common law offence. It is purely a statutory offence, created by that section of the act.

It is an established rule of criminal law, that if a statute creates an offence, and by the same clause prescribes a particular mode of proceeding, otherwise than by indictment, to enforce the penalty, the mode of procedure prescribed by the statute must be followed and an indictment cannot be maintained. Whart. Am. Cr. Law, § 10; 2 Burrows, 805; 1 Archb. Cr. Prac. & Pl. 2; 6 Humph. 17;. 7 Spear, 305; 12 Ill. 235; 3 Ala. 375. The penalty prescribed by the seventh section for a violation of its provisions, is a forfeiture of one thousand dollars for each negro, "one moiety to the use of the United States, and the other to the use of the person or persons who may sue for such forfeiture, and prosecute the same to effect." The mode of procedure thus prescribed, for imposing the penalty, is not by indictment, or any other criminal procedure. but a civil suit, well known as a qui tam action. Upon this ground, also, the indictment cannot be supported.

It is unnecessary to examine the other more technical objections to the indictment. For the reasons stated, the demurrer to the indictment is sustained, and there must be a judgment for the defendant.